JUDGE SWAIN

PREET BHARARA
United States Attorney for the
Southern District of New York
By: JASON H. COWLEY
DANIEL W. LEVY
DAVID B. MASSEY
Assistant United States Attorneys
One St. Andrew's Plaza
New York, New York 10007

12 CIV 0836

RECEIVED
FEB 02 2012
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA, :

Plaintiff, :

-v.- : 12 Civ.

ALL FUNDS ON DEPOSIT AT UBS AG, ACCOUNT NO. 101-WA-358967-000, HELD IN THE NAME OF WEGELIN & CO., : VERIFIED COMPLAINT

Defendants *in rem*. :

- - - - - - - - - - - - - - - - - - - - - - -x

Plaintiff United States of America, by its attorney, PREET BHARARA, United States Attorney for the Southern District of New York, for its Verified Complaint alleges, upon information and belief, as follows:

## I. NATURE OF THE ACTION

1. This an action by the United States of America seeking forfeiture of all funds, approximately $16.2 million, on deposit at UBS AG, Account No. 101-WA-358967-000, held in the name of Wegelin & Co. (the "Defendant Funds"). The Defendant Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in transactions in violation of 18 U.S.C. § 1956.

2. The Internal Revenue Service, Criminal Investigation ("IRS-CI") has conducted an investigation regarding a conspiracy among Wegelin & Co. ("Wegelin"), more than 100 U.S. taxpayer-clients of Wegelin, and others known and unknown to defraud the United States of certain taxes due and owing, among other things, concealing from the Internal Revenue Service ("IRS") undeclared accounts owned by U.S. taxpayers at Wegelin and other Swiss banks. As set forth below, it was part of this scheme to provide U.S. taxpayer-clients of Wegelin and other Swiss banks who had undeclared accounts in Switzerland access to their undeclared funds in the United States in a manner that obscured the source of these funds, that is, the U.S. taxpayer-clients' undeclared accounts in Switzerland. To promote and further this scheme to defraud, Wegelin and other Swiss banks used Wegelin's correspondent bank account in the United States to launder undeclared funds from Switzerland to U.S. taxpayer-clients in a manner that facilitated the continued concealment of these undeclared accounts from the IRS. The high volume of other transactions and other funds moving in and out of Wegelin's correspondent account contemporaneously with the laundering of these undeclared assets helped to facilitate these money laundering transactions by making their true nature more difficult to detect and to lend these transactions an aura of legitimacy.

## II. JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

4. Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the Southern District of New York.

## III. PROBABLE CAUSE FOR FORFEITURE

### Background

### Wegelin Bank and Its Co-Conspirators

5. At all times relevant to this Complaint, Wegelin was a Swiss private bank with offices only in Switzerland. Its headquarters were located in the city of St. Gallen. Wegelin provided private banking, asset management, and other services to individuals and entities around the world, including U.S. taxpayers in the Southern District of New York. Wegelin provided these services through "client advisors" based in its various branches in Switzerland ("Client Advisors"). Wegelin was principally owned by a small group of managing partners ("Managing Partners") and was governed by an executive committee that included the Managing Partners (the "Executive Committee"). Wegelin did not maintain an office or branch in the United States, but it directly accessed the U.S. banking system through a correspondent bank account, Account No. 101-WA-358967-000, held

at UBS AG ("UBS") in Stamford, Connecticut (the "Stamford Correspondent Account").

6. From at least in or about 2008 up through and including at least in or about 2010, Michael Berlinka ("Berlinka") worked as a Client Advisor at Wegelin's Zurich branch (the "Zurich Branch").

7. From at least in or about 2006 up through and including in or about 2010, Urs Frei ("Frei") worked as a Client Advisor at Wegelin's Zurich Branch.

8. From at least in or about 2007 up through and including in or about 2010, Roger Keller ("Keller"), worked as a Client Advisor at Wegelin's Zurich Branch. When Keller was out of the office and could not communicate with, or provide services to his U.S. taxpayer-clients, Frei served as his backup, and vice versa.

9. On or about January 3, 2012, Keller, Frei, and Berlinka were indicted by a federal grand jury in the Southern District of New York for conspiring to defraud the United States of America and an agency thereof, the IRS, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Sections 7206(1) and 7201. <u>See</u> <u>United States v. Berlinka, et al.</u>, 12 Cr. 2 (JSR) (attached hereto as Exhibit A and incorporated by reference herein).

10. From in or about 2005 up through and including in or about 2010, Client Advisor A, a co-conspirator, worked as a Client Advisor at the Zurich Branch. At various times, Client Advisor A also served as the "team leader" of Berlinka, Frei, and Keller, and other Client Advisors of the Zurich Branch. As a team leader, Client Advisor A coordinated certain activities of, but did not supervise, these and other Client Advisors.

11. From in or about 2007 up through and including in or about 2011, Managing Partner A, a co-conspirator, was one of the Managing Partners of Wegelin. From in or about 2005 up through and including in or about 2011, Managing Partner A was the head of Wegelin's Zurich Branch. During that period, Managing Partner A supervised Berlinka, Frei, and Keller, Client Advisor A, and other Client Advisors in the Zurich Branch with respect to, among other things, the opening and servicing of "undeclared accounts" for U.S. taxpayers. Undeclared accounts are bank and securities accounts for U.S. taxpayers in which the assets, and the income generated in them, were not reported by the U.S. taxpayers to the taxation authority of the United States, the IRS.

12. From in or about 2008 up through and including in or about 2012, Executive A, a co-conspirator, was a member of the Executive Committee of Wegelin. At all times relevant to this Complaint, Executive A worked primarily at the Zurich Branch.

13. At all times relevant to this Complaint, Beda Singenberger ("Singenberger"), a co-conspirator, owned, operated, and controlled an investment advisory business based in Zurich called Sinco Treuhand AG ("Sinco Trust"). Beginning at least in or about 2000, Singenberger, through Sinco Trust, served as an independent asset manager for various U.S. taxpayers who held undeclared accounts at Wegelin, UBS, and other Swiss banks. Singenberger helped U.S. taxpayers hide such accounts, and the income generated therein, by, among other things, creating sham corporations and foundations for U.S. taxpayers as vehicles through which the U.S. taxpayers could hold their undeclared accounts at UBS, Wegelin, and other Swiss private banks, and by serving as the asset manager for U.S. taxpayers who held undeclared accounts at these banks. From at least in or about 2002 to in or about 2006, Singenberger regularly traveled to the Southern District of New York and other places in the United States to meet with his U.S. taxpayer-clients with undeclared accounts at UBS, Wegelin, and other Swiss private banks.

14. From in or about the mid-1990s up through and including in or about late 2008, Gian Gisler ("Gisler"), a co-conspirator, worked as a client advisor at UBS in Switzerland. From in or about early 2009 up through and including in or about mid to late 2009, Gisler served as an independent asset manager at a Swiss asset management firm ("Swiss Asset Manager A") for

U.S. taxpayers who held undeclared accounts at Wegelin, UBS, and other Swiss banks. Gisler managed and/or assisted in opening at least seven undeclared accounts for U.S. taxpayers at Wegelin. At all times relevant to this Complaint, Swiss Asset Manager A did not maintain an office in the United States.

15. At all times relevant to this Complaint, Swiss Bank C and Swiss Bank D were other banks in Switzerland that held undeclared accounts for U.S. taxpayers. As set forth more fully below, Swiss Bank C and Swiss Bank D used Wegelin's correspondent account to provide its U.S. taxpayer-clients access to their undeclared funds.

**Obligations of United States Taxpayers**
**<u>With Respect to Foreign Financial Accounts</u>**

16. At all times relevant to this Indictment, citizens and residents of the United States who had income in any one calendar year in excess of a threshold amount ("U.S. taxpayers") were required to file a U.S. Individual Income Tax Return, Form 1040 ("Form 1040"), for that calendar year with the IRS. On Form 1040, U.S. taxpayers were obligated to report their worldwide income, including income earned in foreign bank accounts. In addition, when a U.S. taxpayer completed Schedule B of Form 1040, he or she was required to indicate whether "at any time during [the relevant calendar year]" the filer had "an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or

other financial account," and if so, the U.S. taxpayer was required to name the country.

17. In addition, U.S. taxpayers who had a financial interest in, or signature or other authority over a foreign bank account with an aggregate value of more than $10,000 at any time during a particular calendar year were required to file with the IRS a Report of Foreign Bank and Financial Accounts, Form TD F 90-22.1 ("FBAR") on or before June 30 of the following year. In general, the FBAR required that the U.S. taxpayer filing the form identify the financial institution with which the financial account was held, the type of account (either bank, securities, or other), the account number, and the maximum value of the account during the calendar year for which the FBAR was being filed.

**The Nature and Risks of Correspondent Banking and Wegelin's Correspondent Account at UBS**

18. As reported in a 2001 investigative report published by the Minority Staff of the Senate Permanent Subcommittee on Investigations entitled Correspondent Banking: A Gateway For Money Laundering:

> Correspondent banking is the provision of banking services by one bank to another bank. It is a lucrative and important segment of the banking industry. It enables banks to conduct business and provide services for their customers in jurisdictions where the banks have no physical presence. For example, a bank that is licensed in a foreign country and has no office in the United States may want to provide certain services in the United States for its customers in order [to] attract or retain the business of important clients with U.S. business activities. Instead of bearing the costs of licensing, staffing and operating its own offices in the United States, the bank might open a correspondent account with an existing U.S. bank. By establishing such a relationship, the foreign bank, called a respondent, and through it, its customers, can receive many or all of the services offered by the U.S. bank, called the correspondent.
>
> Today, banks establish multiple correspondent relationships throughout the world so they may engage in international financial transactions for themselves and their clients in places where they do not have a physical presence. Many of the largest international banks located in the major financial centers of the world serve as correspondents for thousands of other banks. Due to U.S. prominence in international trade and the high demand for U.S. dollars due to their overall stability, most foreign banks that wish to provide international services to their customers have accounts in the United States capable of transacting business in U.S. dollars. Those that lack a physical presence in the U.S. will do so through correspondent accounts, creating a large market for those services.

Correspondent Banking: A Gateway For Money Laundering (Feb. 2001).

19. Because foreign financial institutions may not be subject to oversight by U.S. regulatory authorities, providing these foreign financial institutions access to the U.S. financial system through the correspondent banking system increases the risk of money laundering. In order to combat these risks, among other means, Federal Financial Institutions Examination Council ("FFIEC") publishes The Bank Secrecy Act/Anti-Money Laundering Handbook (the "Handbook"), a publication that helps identify money-laundering risks and establishs guidelines for U.S. financial institutions to mitigate those risks. In terms of correspondent accounts, the Handbook explains their inherent money-laundering risk and how criminal elements such as drug traffickers have used them to launder funds. The Handbook further explains:

> Because of the large amount of funds, multiple transactions, and the U.S. bank's potential lack of familiarity with the foreign correspondent financial institution's customer, criminals and terrorists can more easily conceal the source and use of illicit funds. Consequently, each U.S. bank, including all overseas branches, offices, and subsidiaries, should closely monitor transactions related to foreign correspondent accounts.

Handbook, Correspondent Accounts (Foreign) — Overview.

20. The Handbook also explains the danger of "nested" foreign correspondent accounts. "Nested accounts occur when a

foreign financial institution gains access to the U.S. financial system by operating through a U.S. correspondent account belonging to another foreign financial institution." These nested accounts pose a further money-laundering risk because they provide additional foreign financial institutions access to the U.S. financial system and make it more difficult to identify the source and nature of the funds being sent to or from a correspondent account at a U.S. financial system.

21. Because of the heightened risk of money laundering through correspondent accounts, the U.S.A. Patriot Act and related regulations impose certain obligations on U.S. financial institutions housing correspondent accounts for foreign financial institutions to guard against money laundering. As explained in the Handbook:

> Due diligence policies, procedures, and controls must include each of the following:
>
> - Determining whether each such foreign correspondent account is subject to [Enhanced Due Diligence].
> - Assessing the money laundering risks presented by each such foreign correspondent account.
> - Applying risk-based procedures and controls to each such foreign correspondent account reasonably designed to detect and report known or suspected money laundering activity, including a periodic review of the correspondent account activity sufficient to determine consistency with information obtained about the type, purpose, and anticipated activity of the account.

Handbook, Foreign Correspondent Account Recordkeeping and Due Diligence — Overview.

22. Since at least the late 1990s, Wegelin has had a correspondent bank account with UBS in Stamford, Connecticut. Through this correspondent relationship, Wegelin could wire funds from Switzerland to the Stamford Correspondent Account in the United States and, in turn, wire funds from the Stamford Correspondent Account to other accounts in the United States or to accounts overseas. Wegelin also had the ability to issue checks drawn on the Stamford Correspondent Account. These checks functioned like any check drawn on an account at a U.S. financial institution and could be deposited, or cashed for U.S. dollars, at other financial institutions.

23. Wegelin also offered nested correspondent services to other Swiss banks, including Swiss Bank C and Swiss Bank D, two Swiss banks that also held undeclared accounts for U.S. taxpayers. These additional Swiss banks were able to have Wegelin issue checks drawn on the Stamford Correspondent Account on their behalf. Swiss Bank C used this nested relationship, despite the fact that Swiss Bank C maintained its own correspondent account with UBS in the United States, which allowed it to conduct wire transactions in the United States, but did not include check-writing abilities.

**Overview of Wegelin and Its Co-Conspirators' Mail and Wire Fraud Scheme to Defraud the United States**

24. From at least in or about 2005 up through and including in or about 2011, more than 100 U.S. taxpayer-clients of Wegelin and other Swiss banks, conspired with, at various times, Wegelin and many of Weglin's employees, including Berlinka, Frei, Keller, Managing Partner A, Executive A, Client Advisor A, other Client Advisors at Wegelin, Swiss Bank C and Swiss Bank D, and others known and unknown, to defraud the United States of certain taxes due and owed by concealing from the IRS undeclared accounts owned by U.S. taxpayers at Wegelin and other Swiss Banks including Swiss Bank C and Swiss Bank D. As of in or about 2010, the total value of such undeclared accounts at Wegelin alone was at least $1.2 billion. In particular, Client Advisors at Wegelin, including Berlinka, Frei, and Keller, and others opened dozens of new undeclared Wegelin accounts for U.S. taxpayers in or about 2008 and 2009 after UBS and another large international bank based in Switzerland ("Swiss Bank B") closed their businesses servicing undeclared accounts for U.S. taxpayers ("the U.S. cross-border banking businesses") in the wake of widespread news reports in Switzerland and the United States that the U.S. Department of Justice was investigating UBS for helping U.S. taxpayers evade taxes and hide assets in Swiss bank accounts. These Client Advisors did so after the Managing Partners, including Managing Partner A, affirmatively decided to

take advantage of the flight of U.S. taxpayer-clients from UBS by opening new undeclared accounts for these U.S. taxpayers at Wegelin. As a result of this influx of former UBS U.S. taxpayer-clients into Wegelin, Wegelin's undeclared U.S. taxpayer assets under management, and the fees earned by managing those assets, increased substantially. As part of their sales pitch to U.S. taxpayer-clients who were fleeing UBS, at various times, client advisors at Wegelin told U.S. taxpayer-clients that their undeclared accounts at Wegelin would not be disclosed to the United States authorities because Wegelin had a long tradition of bank secrecy and, unlike UBS, did not have offices outside Switzerland, thereby making Wegelin less vulnerable to United States law enforcement pressure. Managing Partner A and another executive of Wegelin participated in some of these meetings. At various times, Berlinka, Frei, and Keller collectively managed undeclared U.S. taxpayer assets worth hundreds of millions of dollars. As part of the scheme to defraud, Wegelin, Swiss Bank C, and Swiss Bank D provided U.S. taxpayer-clients with undeclared accounts access to funds in these undeclared accounts in a manner that obscured the source of these funds, that is, the U.S. taxpayer-clients' undeclared accounts in Switzerland. Also as part of this scheme, these U.S. taxpayer-clients, used the U.S. mails, private and commercial interstate carriers, and interstate wire communications to submit tax returns that were

materially false and fraudulent in that these returns failed to disclose these undeclared accounts or the income generated from these accounts.

Means and Methods of the Conspiracy

25. Among the means and methods by which Wegelin and its co-conspirators carried out the conspiracy were the following:

a. Client Advisors at Wegelin opened and serviced undeclared accounts for U.S. taxpayers for the purpose of helping the U.S. taxpayers hide assets and income from the IRS.

b. Client Advisors at Wegelin opened and serviced undeclared accounts for U.S. taxpayer-clients in the name of sham corporations and foundations formed under the laws of Liechtenstein, Panama, Hong Kong, and other jurisdictions for the purpose of concealing the identities of the beneficial owners of those accounts -- that is, their U.S. taxpayer-clients -- from the IRS.

c. Client Advisors at Wegelin knowingly received and retained at Wegelin documents that falsely declared that such sham entities were the beneficial owners of certain accounts, when the client advisors knew that U.S. taxpayer-clients beneficially owned such accounts.

d. Client Advisors at Wegelin permitted certain U.S. taxpayers to open and maintain undeclared accounts at Wegelin using code names and numbers (so-called "numbered accounts") so that the identities of the U.S. taxpayer-clients would appear on a minimal number of bank documents in the event that documents or databases were stolen from Wegelin or otherwise fell into the hands of third parties.

e. Client Advisors at Wegelin ensured that account statements and other mail for their U.S. taxpayer-clients were not mailed to them in the United States.

f. Client Advisors at Wegelin sent e-mails and Federal Express packages to potential U.S. taxpayer-clients in the United States to solicit new private banking and asset management business.

g. At various times from in or about 2005 up through and including in or about 2007, Client Advisors at Wegelin communicated by e-mail and/or telephone with U.S. taxpayer-clients who had undeclared accounts at Wegelin. Client Advisors sometimes used their personal e-mail accounts to communicate with U.S. taxpayers to reduce the risk of detection by law enforcement authorities.

h. Wegelin opened undeclared accounts for U.S. taxpayers referred to them by, and whose account opening

paperwork was completed by, an investment advisor in Manhattan and a lawyer in Los Angeles, California.

i. Beginning in or about late 2008 or early 2009, after Wegelin began to open new undeclared accounts for U.S. taxpayers whose accounts were being closed by UBS, Managing Partner A instructed Wegelin Client Advisors of the Zurich Branch not to communicate with their U.S. taxpayer-clients by telephone or e-mail, and instead to cause their U.S. taxpayer-clients to travel from the United States to Switzerland to conduct business relating to their undeclared accounts.

j. Berlinka advised U.S. taxpayer-clients not to voluntarily disclose undeclared accounts to the IRS and assured them that their Wegelin account information would not be disclosed to United States authorities.

k. Wegelin, Swiss Bank C, and Swiss Bank D provided U.S. taxpayer-clients with undeclared accounts access to, and use of, the funds in these undeclared accounts in manner that helped U.S. taxpayer-clients keep these undeclared accounts concealed and continue to avoid paying taxes due and owed from the income generated in these accounts.

l. Various U.S. taxpayer-clients of Wegelin and other Swiss banks, including Swiss Bank C and Swiss Bank D, utilizing the mails and wires, filed Forms 1040 that falsely and fraudulently failed to report the existence of, and the income

generated from, their undeclared Wegelin accounts; evaded substantial income taxes due and owing to the IRS, thus defrauding the IRS of these funds; and failed to file FBARs identifying their undeclared accounts.

**Wegelin Solicited New Undeclared Accounts Through a Third-Party Website**

26. From in or about 2005 up through and including in or about 2009, Wegelin solicited new business from U.S. taxpayers wishing to open undeclared accounts in Switzerland by recruiting clients through the third-party website "SwissPrivateBank.com." As of on or about July 2, 2007, this website advertised "Swiss Numbered Bank Account[s]" and "Swiss Anonymous Bank Account[s]", among other things. Specifically, the website stated:

> Swiss banking laws are very strict and it is illegal for a banker to reveal the personal details of an account number unless ordered to do so by a judge.
>
> This is long established in Swiss law. Any banker who reveals information about you without your consent risks a custodial sentance [sic] if convicted, with the only exceptions to this rule concerning serious violent crimes.
>
> Swiss banking secrecy is not lifted for tax evasion. The reason for this is because failure to report income or assets is not considered a crime under Swiss banking law. As such, neither the Swiss government, nor any other government, can obtain information about your bank account. They must first convince a Swiss judge that you have committed a serious crime punishable by the Swiss Penal Code.

The website invited users to "[r]equest a Swiss banking consultation today" by clicking a link to a "Consultation